<u>NOT FOR PUBLICATION</u>                                    [112, 122, 125]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

JOHN STASICKY,

               Plaintiff,

               v.

SOUTH WOODS STATE PRISON, et al.,

               Defendants.

_____

Civil No. 03-369 (FLW)

**OPINION**

<u>WOLFSON, UNITED STATES DISTRICT JUDGE</u>

Before the Court are motions by Defendants Dr. Kaldany and Dr. Robert Thompson ("Defendants"), for Summary Judgment, pursuant to <u>Fed. R. Civ. P.</u> 56(c) . In his Complaint, Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that while he was incarcerated at the South Woods State Prison ("SWSP"),[1] Defendants violated his Eight Amendment right to be free from cruel and unusual punishment by failing to protect him from a sexual assault. Specifically, Plaintiff claims that Dr. Kaldany "did nothing more than overdose [P]laintiff with medications causing [P]laintiff to pass out, which later led to the rape" of Plaintiff. Plaintiff's Second Amended Complaint, filed November 0, 2004, ("Sec. Am. Compl."), at 3. Further, Plaintiff claims that Dr. Kaldany "not only knew of the upcoming sexual assault upon [P]laintiff," but "tried to ease the pain by overdosing [P]laintiff . . . ." <u>Id.</u> at 4. With regard to Dr. Thompson, Plaintiff specifically claims that Dr. Thompson violated his rights by "negligently placing

---

[1]On September 1, 2006, Plaintiff was administratively transferred from SWSP to Bayside State Prison in Leesburg, New Jersey. Plaintiff's Opposition Brief, dated September 14, 2006, (Pl. Opp. Br.), at 1.

[P]laintiff on close watch/ECU with deliberate indifference by not re-evaluating the situation with housing Sgt. Pitts or [P]laintiff prior to such on January 25, 2001." Id. at 3.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. For the reasons that follow, the Court finds that Plaintiff has failed to meet his burden to affirmatively identify genuine, material factual issues sufficient to defeat Defendants' Motions for Summary Judgment. Accordingly, for the reasons that follow, Plaintiff's claims against Defendants are dismissed.

## I.    BACKGROUND

Plaintiff was an inmate at SWSP, who had received mental health counseling at the facility.[2] He alleges that on January 23, 2001, he "hear[d] rumors" that he might be moved either within SWSP or to another facility. Sec. Am. Compl. at 3. At that time, Plaintiff began to experience what he described as panic attacks, the severity of which he asserts rendered him unable to work at his prison job. Id. According to Plaintiff, Defendant Dr. Robert Thompson, a SWSP staff psychologist, who had been treating Plaintiff, evaluated him at the time and concluded that Plaintiff was suffering from "paranoia and instability." Id.

On January 25, 2001, Plaintiff heard that he would be moved that day from his cell within SWSP. Stasicky Dep. at 38:10-25. In response to that news, Plaintiff "began stressing hard" and experiencing "a lot of anxiety" about the move. Id. at 39:3-4. In fact, Plaintiff "was scared to death" of the move. Id. at 42:5. As a result of Plaintiff's panic attacks, Plaintiff was removed from his cell and placed in the Emergency Care Unit ("ECU") on suicide watch. Id. at 46:14-20. Dr. Thompson's notes from January 25, 2001, which were signed on January 26, 2001 at 8:18

_____

[2]Plaintiff conceded that he has a long history of mental health issues and counseling. Stasicky Dep. at 29:3-25.

am, reveal that Plaintiff was transferred to ECU because of his diminishing capacity.  Defendant

Thompson's Second Motion for Summary Judgment, dated December 16, 2006 (Thompson's

Sec. Motion"), at Ex. D-2, p. 12.  Dr. Thompson wrote:

> Was asked by custody to see inmate in holding cell secondary to order
> him to be transferred to ECU on suicide watch.  Inmate seen with
> social worker Danielle Hutchinson, who has been involved with his
> care and who is on his treatment team.  Inmate's presentation was
> agitated, irrational and threatening.  He complained that he was
> convinced that he was going to be "beaten up" by the officers as a
> part of transfer to ECU, despite explanations by ourselves and by
> custody officers that every precaution was being taken to insure that
> no one would be hurt.  Inmate made a number of overt threats toward
> custody if and when they came to transport him out of the cell.
> Inmate was not responsive to our interventions and in fact continued
> to escalate his threats, saying such things as "it [sic] they come in
> here, somebody's gonna get hurt!"  Given the continued
> decompensation in the inmate's functioning, his irrationality and
> unresponsiveness to interventions, and his escalating threats toward
> others, I authorized the use of force if necessary in order to safely
> transport the inmate to ECU.  Also, have decided to upgrade his
> watch status to constant.  Mental health will continue to evaluate,
> monitor and treat the inmate in ECU.  Will evaluate for possible 11R
> placement, given the inmate's decompensation even prior to today's
> events.

Id.

Dr. Allen Goldberg also met with Plaintiff on January 25, 2001, and his notes, which

were signed at 9:14 am, reveal that Plaintiff was:

> UPSET AND TEARFUL, CRYING, RELATES LONG HIST OF
> PHYSICAL AND SEXUAL ABUSE.  TOLD HE WAS TO BE
> TRANSFERRED TO ANOTHER UNIT BECAME PANICY [sic]
> PRESENTLY SHAKING, CRYING, SOB, PALPATIONS. FEELS
> HIS MEDS NOT WORKING WANTS XANAX.  PRESENTLY ON
> KLONOPIN, PAXIL, NEURONTIN [WILL ADJUST KLONOPIN]

Id. at Ex. D-3, p.2.

Dr. Thompson's other notes from January 25, 2001, which were signed at 12:59 pm, reveal that Plaintiff had a prior history of suicide attempts and Dr. Thompson ordered the watch because Plaintiff was "[m]arkedly [d]epressed" and exhibited "[p]sychiatric [d]ecompensation." Id. at Ex. D-3, p.1.  Dr. Thompson continued to monitor Plaintiff on January 25, 2001. According to Dr. Thompson's later notes from January 25, 2001, which were signed at 2:56 pm, Plaintiff's condition did not improve, and therefore Dr. Thompson upgraded Plaintiff's "watch status to constant watch . . . ."  Id. at Ex. D-2, p. 11.  Specifically, Dr. Thompson found:

> This inmate was placed on close watch earlier today.  However, have just seen him in the holding cell.  He is markedly agitated, unable to respond to interventions with lessened agitation, and is making threats to hurt the custody officers charged with moving him to ECU. For these reasons–that is, for the protection of the inmate and others–have decided to upgrade his watch status to constant watch until he is in better control and stabilized psychiatrically.

Id.

Later that day when Dr. Kaldany visited Plaintiff, Plaintiff requested that Dr. Kaldany prescribe him more medication.  Id. at Ex. D-2, p. 9.  Dr. Kaldany's notes, which were signed on January 25, 2001 at 4:17 pm reveal:

> Inmate seen emergently for potential forced meds.  Apparently inmate was inadvertently sent to ECU and this precipitated some panicky feelings and statements based on past abuse of inmate by male officers in the past.  During our conversations inmate was very lucid and calm, he cooperated during the strip search and agreed not to act violently thru the night.  He has regrets for losing his temper and asked or [sic] a one time dose of Elavil 150mg.  [W]ill maintain inmate on close watch tonight and consider release back to P2 in am if he remains cooperative.  Inmate seen with Dr. Liberatore and discussed with Dr. [T]hompson.  All parties are in agreement with

4

plans and history reported is consistent internally.

Id.  Dr. Kaldany listed Plaintiff's medications as:

> FOLIC ACID 1 MG PO QD
> MVI 1 TAB PO QD
> ENSURE 1 CAN BID
> ZANTAC 150 MG PO BID
> NAPROSYN 500 MG PO BID PRN
> ROBAXIN 500 MG PO TID PRN
> PAXIL TABS 20 MG Take 2 tab po daily qhs
> NEUONTIN CAPS 300 MG 2 po tid
> VISTRIL CAPS 25 MG Take 1 Cap TID
> KLONOPIN TABS 2 MG 1 TAB PO TID [INCREASE]
> ELVAIL TABS 150 MG One tab p.o. at H.S. on etime tonight only

Id.  Dr. Kaldany also listed Elavil as a "New or Changed" Medication.  Id.

Plaintiff claims that some time later on January 25, 2001, as he lay sleeping, he was awakened by several unknown individuals who he alleges held him down and sexually assaulted him with an unknown object.  Sec. Am. Compl. at 5.  Plaintiff claims that his assailants threatened to kill him if he told anyone about the attack, and warned Plaintiff to "watch [his] back." Id. at 5-6.  Plaintiff never saw his alleged assailants directly, but asserts that they were SWSP corrections officers based on the blue uniforms Plaintiff claims they were wearing and that their "voices sounded very familiar . . . ."  Id.  Plaintiff claims that after the alleged sexual assault he "lay crying and bleeding from the anus . . . [but] didn't immediately report anything due to the threats . . . for his life."  Id. at 6.

On January 23, 2003, Plaintiff filed a Complaint against SWSP, the New Jersey Department of Corrections Special Investigation Division ("SID"), Correctional Behavioral Solutions, and certain John Doe defendants.  See generally Compl.  On June 9, 2004, the Court

granted Plaintiff leave to file an Amended Complaint.[3]  In his Amended Complaint, Plaintiff named Defendant Finger and Defendants Jack Terhune, the former Commissioner of the New Jersey Department of Corrections; Sergeant Pitts, of SWSP; and Doctors Thompson, Kaldany, and Blackwell, who are mental health professionals associated with SWSP. See Plaintiff's Am. Compl.  On November 30, 2004, Plaintiff filed a Second Amended Complaint in which he clarified the parties against whom he wished to proceed. See Plaintiff's Sec. Am. Compl. Plaintiff named Defendants Finger, Gunn, Melendez, CMS, SID, Dr. Kaldany, Dr. Thompson, Stanley Nunn, whom Plaintiff alleges is a State official responsible for housing and other inmate services in the New Jersey Department of Corrections, and John Does 1-20.[4]

Since instituting this action, Plaintiff has filed numerous motions seeking various relief, as well as several letters challenging certain rulings by the Court and the Magistrate Judge assigned to this case.  On December 8, 2005, Defendants Dennis Gunn and Robert Melendez ("SWSP Defendants") and Defendant Finger filed a Motion to Dismiss in Lieu of an Answer, pursuant to Fed. R. Civ. P. 12(b)(6), or, alternatively for Summary Judgment pursuant to Fed. R. Civ. P. 56.  By Stipulated Order entered April 10, 2006, Plaintiff's claims against Defendant Finger were dismissed with prejudice.  Stipulation of Voluntary Dismissal, dated April 10, 2006.

_____

[3] In the Court's September 13, 2004 Order, the Court directed that all references in Plaintiff's pleadings to "Correctional Behavioral Solutions" shall mean "Correctional Medical Services" ("CMS").

[4] In his Motion to Amend, Plaintiff made clear that he sought to substitute this list of Defendants for those he had named earlier. See Plaintiff's Motion to Amend Complaint. Consequently, after filing Plaintiff's Second Amended Complaint, the Clerk of the Court terminated Defendants Terhune, Blackwell, and Pitts, who were not named in Plaintiff's Second Amended Complaint.  At that time, the remaining Defendants in this matter were: Defendants Finger, Gunn, Melendez, CMS, Dr. Kaldany, Dr. Thompson, and Stanley Nunn.

On September 6, 2007, the Court granted SWSP Defendants' motion and Plaintiff's claims against Defendants Gunn and Melendez were also dismissed.  Opinion, dated September 6, 2007 ("Sept. 6, 2007 Op."), at 20-21.[5]  On February 28, 2007, the Court granted CMS's Motion for Summary Judgment, and Plaintiff's  claims against Defendant CMS were dismissed.  Opinion, dated February 28, 2007 ("Feb. 28, 2007 Op."), at 1.[6]

Defendant Thompson, on August 16, 2006, moved for summary judgment, and Defendant Kaldany, on November 1, 2006, moved for summary judgment.  Plaintiff opposed Defendant Thompson's Motion on September 21, 2006.  The Court administratively terminated Defendant Thompson's Motion on December 1, 2006 "[t]o allow the parties to fully brief the issues on the basis of all exhibits that are relied upon, and give the Plaintiff an opportunity to oppose the motion with the benefit of said attachments . . . ."  Letter from the Court to Erin McLaughlin, Esq. and Plaintiff, dated December 1, 2006 ("Dec. 1, 2006 Letter").  The Court's letter informed the parties that "[i]n accordance with Judge Bongiovanni's ruling, Dr. Thompson may re-file his motion for summary judgment and provide Plaintiff with all exhibits to the motion, or may re-file the motion and elect to June 11, 2007 remove the exhibits at issue from the briefing altogether, and not rely thereon."  Id.  On December 6, 2006, Defendant Thompson re-filed his Motion and attached all the exhibits he relied on in his Motion.  However, on December 27, 2006, counsel for Defendant Thompson requested that the hearing date for the Motion be extended because the

---

[5]The Court's September 6, 2007 Opinion sets forth this case's extensive procedural history.

[6]Although in its August 16, 2006 motion, CMS contended that its motion was filed on behalf of Defendants CMS, Kaldany, Thompson and Blackwell, the Court understood the motion to be on behalf of CMS only, as Thompson and Kaldany moved individually for summary judgment through their own counsel, and Blackwell was previously dismissed as a Defendant.

two copies of the Motion she sent to Plaintiff at Bayside State Prison (one copy was sent via

certified mail and one copy was sent via first class mail) were returned as undeliverable.  Letter

from Erin McLaughlin, Esq. to the Court, dated December 27, 2006 ("Dec. 27, 2006 Letter").

Defendant's counsel verified that she had the correct address for Plaintiff, and she resent two

copies of the Motion to Plaintiff, but requested that "the Court adjourn the hearing date in order

to allow the [P]laintiff time to review" Defendant Thompson's moving papers.  Id.  The Court

granted counsel's request, and the Motion was adjourned to February 6, 2007.  Plaintiff did not

file a written opposition to Defendant Thompson's December 6, 2006 Motion.

 With regard to Defendant Kaldany's Motion, the Court, on its own review of the docket,

noticed that Defendant Kaldany had served Plaintiff at Plaintiff's previous address at SWSP and

not at Bayside State Prison.  Since Plaintiff failed to file a written opposition to Defendant

Kaldany's Motion, the Court contacted Defendant Kaldany's counsel to see whether Defendant

Kaldany's Motion that was sent to Plaintiff was returned as undeliverable.  In a letter to the

Court, dated April 20, 2007, Dr. Kaldany's counsel, F. James Gallo, wrote:

> I am writing to advise Your Honor that, following inquiry from your
> office, I have personally thoroughly examined our file in this case,
> and searched our office, and can advise that the copy of our Summary
> Judgment Motion on behalf of Dr. Kaldany, which was mailed to
> [P]laintiff at the time of filing on November 1, 2006, was never
> returned to us, nor have we received any notice or indication of non-
> delivery same.
>
> I have also inquired of all personnel here who had anything to do with
> the case and the Motion, and none of them recall every [sic] receiving
> anything back.

Letter from F. James Gallo to the Honorable Freda L. Wolfson, dated April 20, 2007.  Mr. Gallo

sent a copy of his April 20, 2007 letter to Plaintiff at the Bayside State Prison.  To date, Plaintiff

has neither opposed Defendant Kaldany's Motion or responded to Mr. Gallo's letter.

Accordingly, now before the Court are Motions filed by Defendants Thompson and

Kaldany.  With regard to Defendant Thompson's Motion, the Court will consider Plaintiff's

September 16, 2006 response as Plaintiff's written opposition to Defendant Thompson's Motion.

However, with regard to Dr. Kaldany's Motion, the Court will consider the Motion unopposed as

Plaintiff has not filed any written response to Defendant Kaldany's Motion.

## II.    DISCUSSION

### A.    Standard for Summary Judgement Pursuant to <u>Fed. R. Civ. P.</u> 56(c)

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." <u>Fed. R. Civ. P.</u> 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986).  A fact is

"material only if it might affect the outcome of the suit under the applicable rule of law.  <u>Id</u>.

Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  <u>Id</u>.

The burden of establishing that no "genuine issue" exists is on the party moving for summary

judgment. <u>Celotex</u>, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-

moving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Fed. R.

Civ. P.</u> 56(e).  To do so, the non-moving party must "go beyond the pleadings and by her own

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

'specific facts showing that there is a genuine issue for trial.'"  <u>Celotex Corp.</u>, 477 U.S. at 324.

In other words, the non-moving party must "do more than simply show that there is some

metaphysical doubt as to material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475

U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir.

1999).  A genuine issue of material fact is one that will permit a reasonable jury to return a

verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In

evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts

in the light most favorable to the [non-moving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d

Cir. 2002).

  If, as is the case here with regard to Dr. Kaldany's Motion, the non-movant fails to

oppose the motion, Rule 56(e) provides that the Court may only grant the motion for summary

judgment "if appropriate." See, e.g., Anchorage Assocs. v. V.I. Bd. of Tax Rev., 922 F.2d 168,

175 (3d Cir.1990); see also Damino v. Sony Music Entm't, 975 F. Supp. 623, 627 (D.N.J.1996)

(granting summary judgment motion because plaintiff's argument was unopposed, and thus no

genuine issue of material fact was created). The motion is appropriately granted when that party

is entitled to judgment as a matter of law. Anchorage Assocs., 922 F.2d at 175.  When, as here,

"the non-moving party fails to oppose the motion for summary judgment by written objection,

memorandum, affidavits and other evidence, the Court will accept as true all material facts set

forth by the moving party with appropriate record support." Carp v. Internal Revenue Serv., No.

00-5992, 2002 WL 373448, at *2 (D.N.J. Jan. 28, 2002) (quoting  Anchorage Assocs., 922 F.2d

at 175).  Even if a record contains facts that might provide support for a non-movant's position,

"the burden is on the [non-movant], not the court, to cull the record and affirmatively identify

genuine, material factual issues sufficient to defeat a motion for summary judgment." Morris v.

Orman, No. 87-5149, 1989 WL 17549, at *8 (E.D.Pa. Mar. 1, 1989) (citing Childers v. Joseph,

842 F.2d 689 (3d Cir. 1988)); see also Atkinson v. City of Phila., No. 99-1541, 2000 WL

793193, at *5 n.8 (E.D. Pa. June 20, 2000).

**B.      Plaintiff's 42 U.S.C. § 1983 Claims**

Plaintiff alleges, pursuant to 42 U.S.C. § 1983,[7] that Defendants Kaldany and Thompson

violated his Eighth Amendment guarantee of freedom from cruel and unusual punishment.

Specifically, Plaintiff claims that Defendant Kaldany violated his rights by prescribing an

overdose of medication, and said overdose led to his sexual assault.  Sec. Am. Compl. at 3.  With

regard to Defendant Thompson, Plaintiff claims that Defendant Thompson violated his rights by

"negligently placing [P]laintiff on close watch/ECU with deliberate indifference by not re-

evaluating the situation with housing Sgt. Pitts or [P]laintiff prior to such on January 25, 2001."

Id. at 3.  As discussed more fully below, the Court finds that Plaintiff has failed to meet his

burden to affirmatively identify genuine, material factual issues sufficient to defeat Defendants'

Motions for Summary Judgment.

The Eighth Amendment provides a constitutional basis for a § 1983 claim by prisoners

alleging failure to protect. See Farmer v. Brennan, 511 U.S. 825, 837 (1994).  To prevail on such

a claim, a prisoner must establish that the prison official "knows of and disregards an excessive

risk to inmate health or safety; the official must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must also draw the

---

[7] 42 U.S.C. § 1983 provides a private cause of action against any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States.  The statute, in and of itself, is not a source of substantive rights but provides " a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989).  To assert a § 1983 claim, a plaintiff must allege that the defendant, "acting under color of State law," deprived him of a right secured by the Constitution and laws of the United States. West v. Atkins, 487 U.S. 42, 48 (1988); Natale v. Camden County Correctional Facility, 318 F.3d 575, 580-81 (3d Cir. 2003).

inference." Id.  To survive summary judgment, a plaintiff is thus required "to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir.1997).

Similarly, the Eighth Amendment also provides a constitutional basis for a § 1983 claim by prisoners alleging inadequate medical care. See Natale v. Camden County Correctional Facility, 318 F.3d 575, 580-81 (3d Cir. 2003).  However, "[f]ailure to provide medical care to a person in custody can rise to the level of a constitutional violation [of the Eighth Amendment] under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." Groman v. Township of Manalapan, 47 F.3d 628, 636-37 (3d Cir. 1995). The "deliberate indifference" standard is, essentially, a two-pronged test, requiring: (1) that the prisoner's medical needs be serious, and (2) that there be deliberate indifference on the part of defendants. See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir.1987), cert. denied, 486 U.S. 1006 (1988).  Mere disagreement with the form of treatment does not rise to a constitutional violation. Estelle v. Gamble, 429 U.S. 97, 107 (1976).

### 1.    Plaintiff's 42 U.S.C. § 1983 Claim Against Defendant Kaldany

In this case, Plaintiff claims that Dr. Kaldany prescribed him an overdose of medication, which ultimately led to his alleged sexual assault.  Sec. Am. Compl. at 3.  Plaintiff also claims that Dr. Kaldany was aware that Plaintiff would be sexually assaulted.  Id.  Plaintiff has failed to oppose Dr. Kaldany's Motion for Summary Judgment.  As set forth above, when, as here, "the non-moving party fails to oppose the motion for summary judgment by written objection, memorandum, affidavits and other evidence, the Court will accept as true all material facts set

forth by the moving party with appropriate record support." Carp, No. 00-5992, 2002 WL 373448, at *2. In fact, even if a record contains facts that might provide support for a non-movant's position, "the burden is on the [non-movant], not the court, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment." Morris, No. 87-5149, 1989 WL 17549, at *8 (citing Childers v. Joseph, 842 F.2d at 689); see also Atkinson, No. 99-1541, 2000 WL 793193, at *5 n.8.

In order for Plaintiff's § 1983 claim against Dr. Kaldany to survive summary judgment, Plaintiff must establish:  (1) that his medical needs were serious; and (2) that there was a deliberate indifference on the part of Dr. Kaldany in treating Plaintiff's medical needs.  See Inmates of Allegheny County Jail, 612 F.2d at 762; see also  Groman, 47 F.3d at 636-37 ("Failure to provide medical care to a person in custody can rise to the level of a constitutional violation [of the Eighth Amendment] under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs").  A misdiagnosis or mere disagreement with the form of treatment does not rise to the level of a constitutional violation. Estelle, 429 U.S. at 107.   Moreover, medical malpractice does not become an Eighth Amendment violation merely because the victim is a prisoner.  Id. at 106.

Here, Dr. Kaldany argues that "Plaintiff has provided no evidence to support his contention that Dr. Kaldany's conduct rose to the level of 'deliberate indifference.'  Namely, Plaintiff could not establish any evidence that Dr. Kaldany gave Plaintiff twice the dosage of sedatives/anti-anxiety medication that he usually takes."  Dr. Kaldany's Brief in Support of Summary Judgment, dated November 1, 2006 ("Dr. Kaldany's Br.), at 2 (emphasis in original). Further, Dr. Kaldany claims that his actions were in response to "Plaintiff's emotional state," and

13

"Dr. Kaldany only prescribed sedatives/anti-anxiety medication after conferencing with him

[Plaintiff] and procuring Plaintiff's approval."  Id. at 7.  Therefore, Dr. Kaldany argues that

"Plaintiff has produced no evidence to support his claims against [him], there is no genuine issue

of material fact and summary judgment is appropriate."  Id. at 2.  The Court agrees.

Although Dr. Kaldany argues that Plaintiff failed to identify "a serious medical need," the

Court finds that Plaintiff's medical records and Plaintiff's deposition testimony establish that

Plaintiff was in severe emotional distress, and therefore, the Court finds that it is likely that

Plaintiff was suffering from a serious medical need.  However, the evidence demonstrates that

Dr. Kaldany was not deliberately indifferent to Plaintiff's medical needs.  In fact, Plaintiff's own

testimony corroborates the fact that Dr. Kaldany examined and treated Plaintiff's condition.

Plaintiff testified that on the day of the incident he "began stressing hard" and experiencing "a lot

of anxiety . . . ."  Stasicky Dep. at 39:3-4.  In fact, Plaintiff "was scared to death . . . ."  Id. at

42:5.

With regard to the medication prescribed to Plaintiff by Dr. Kaldany, Plaintiff testified:

> Q.   Okay.  And on the day of the incident, I'm going to refer to
>       your complaint because I don't want to misquote you, you
>       said you saw Dr. Kaldany somewhere between 3 and 4 p.m.?
>
> A.   Yeah.  I was just guessing.  I don't know what time it was.
>
> Q.   Sometime in the afternoon.  When you actually saw him, he
>       asked you if you needed any medication.
>
> A.   Yeah.
>
> Q.   He asked you specifically if you needed any medication?
>
> A.   Yeah.  Well, he said would you like something to help you
>       sleep.

14

Q.      Okay.

A.      And I said, yeah.  You know, I wanted to be out, you know go to sleep.  He said, All right.  We'll get you something.

Q.      Did you ever tell him what medications you wanted?

A.      No.

Q.      And you said you took Elavil and Klonopin, is that what you took that day?

A.      I think so because I know that morning they doubled my medication that morning.  And I think what it was that Dr. Kaldany had them give me Elavil.

Q.      What is your basis for knowing that?

A.      Because I used to take Elavil and I'm not sure exactly how much it was that I was taking but I just remember whatever they gave me, I just took.

        I don't think Dr. Kaldany, himself, handed it to me.  I think he had the nurses or whoever, something – like I said, it was all distorted during that time but I know they brought me something that I believed to be Elavil.

Q.      Have either of those two medications ever caused you to pass out in the past?

A.      Well, I know Elavil has, never Klonopin.  Elavil does have a strong effect to it.  As far as knock me out completely like the way it did that night, no.  Even though I know it be strong where I had less or whatever, which is one of the main reasons I wanted to get off it because it left you dazed and confused, never had such a [sic] intoxicating effect as it did that night.  Which I don't think it could have been increased maybe because of the clash of the two, I don't know.

        But you know after that, I was pretty much out of it.

Q.      And it's your estimate that it was double the normal dose that you had traditionally received?

15

A.    Yeah, it had to be my estimate that it definitely had to be more than I've ever taken before.

Q.    What I am getting at is you were given these in pill form?

A.    Yeah.

Q.    Can you tell by looking at the pills, does it say how many milligrams it is on the pill?

A.    No.

Q.    It's an estimate basically that you were given about double?

A.    Yeah.

Q.    And then after the incident, I know that you stated that you spoke to Dr. Kaldany and you said that you told him everything was fine and you wanted to go back to the unit?

A.    Yeah, I think it was – yeah, I'm pretty sure it was Dr. Kaldany that came back.  Yeah, he was the one telling me about the charge.

Q.    Did you tell him about any physical injuries –

A.    No.

Q.    – that had occurred?

A.    No.  Absolutely not.

Q.    Were there any visible signs on you that he could have seen through his eyes?

A.    He's looking through a port hole.  I don't think he could have noticed without me outright telling him look, you know.  I would say he wouldn't be able to see any.

Id. at 88:12-91:21.

The Court finds that Plaintiff's allegations fail to meet the standard of deliberate

16

indifference. Dr. Kaldany's medical notes from January 25, 2001 reveal that Plaintiff requested a change in his medication and "a one time dose of Elavil 150mg." Thompson's Sec. Motion, at Ex. D-2, p. 9. In fact, Plaintiff conceded that he asked Dr. Kaldany for medication that would put him "out" and help him "go to sleep." Stasicky Dep. at 88:24-89:4. Further, even if the Court were to assume Plaintiff's allegation that Dr. Kaldany "doubled" his medication, that allegation does not rise to more than negligence, and as held by the United States Supreme Court, a doctor's negligence is not an Eighth Amendment violation. See Estelle, 429 U.S. at 106. [

With regard to Plaintiff's allegation that Dr. Kaldany was aware of Plaintiff's alleged sexual assault, the Court agrees with Dr. Kaldany that Plaintiff has failed to produce any evidence to support this allegation. Further, the Court notes that pursuant to its September 6, 2006 Opinion, Plaintiff admitted that he himself is uncertain as to "whether the alleged assault ever took place," and he even suggests "that his rectal bleeding was caused by a chronic colon disorder from which he suffers." Sept. 6, 2006 Op. at 19.

Therefore, the Court finds that no genuine issue of material facts exist, and accordingly, summary judgment in favor of Defendant Kaldany is appropriate.

### 2. Plaintiff's 42 U.S.C. § 1983 Claim Against Defendant Thompson

In this case, Plaintiff claims that Dr. Thompson violated his rights by "negligently placing [P]laintiff on close watch/ECU with deliberate indifference" and not re-evalutating his placement later. Sec. Am. Compl. at 3. Defendant Thompson argues that summary judgment is appropriate "because his treatment of Mr. Stasicky [was] not only warranted under the circumstances, but was clinically sound and not in violation of federal law." Dr. Thompson's Brief in Support of Summary Judgment, dated December 6, 2006 ("Dr. Thompson's Br.), at 5. Specifically, Dr.

Thompson argues that he was not deliberately indifferent to Plaintiff's medical needs.  Id. at 8.
Rather, Dr. Thompson argues that "after consultation with other members of the treatment team
at South Woods, [he] determined an appropriate course of treatment for Mr. Stasicky [Plaintiff],"
and he "determined that it was in Mr. Stasicky's best interest to be placed on close watch in the
ECU.  This decision came after a tremendous outburst by the [P]laintiff and is clearly supported
by the record," and New Jersey Administrative Code 10A:16-22.  Id. at 8-9.

       Plaintiff opposes Dr. Thompson's Motion for Summary Judgment[8] and argues that Dr.
Thompson was deliberately indifferent to Plaintiff because Dr. Thompson waited over five hours
to place Plaintiff in the ECU and failed to consult with Sergeant Pitts about Plaintiff's condition.
Pl. Opp. Br. at 4.  According to Plaintiff, had Dr. Thompson consulted with Sergeant Pitts, Dr.
Thompson would have seen that Sergeant Pitts calmed "Plaintiff completely down" and Plaintiff
was no longer opposed to moving facilities.  Id. at 4-5.  However, Plaintiff claims that because
Dr. Thompson failed to consult with Sergeant Pitts, Dr. Thompson's 8:00 am order to move
Plaintiff to the ECU was still in place at 1:00 pm, and as a result, according to Plaintiff, Plaintiff
was "accosted and arrested," which later lead "Plaintiff to be beaten by officers, and then later,
while in ECU, to be sexually assaulted."  Id.

       The Court agrees with Dr. Thompson and finds that there is no constitutional basis for
Plaintiff's § 1983 claim against Dr. Thompson for failure to protect and inadequate medical care.
To prevail on a § 1983 claim alleging failure to protect, Plaintiff must "produce sufficient
evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to
that risk; and (3) causation." Hamilton, 117 F.3d at 746.  Similarly, to prevail on a § 1983 claim

---

[8]As previously mentioned, the Court will consider Plaintiff's September 16, 2006
response as Plaintiff's written opposition to Defendant Thompson's Motion.

alleging inadequate medical care, Plaintiff must establish: (1) that his medical needs were serious, and (2) that Dr. Thompson was deliberately indifferent to Plaintiff's medical needs. Inmates of Allegheny County Jail, 612 F.2d at 762.

Here, the record clearly demonstrates that Dr. Thompson was not deliberately indifferent to Plaintiff's safety and medical concerns.  First, Dr. Thompson's notes from January 25, 2001, reveal that Dr. Thompson monitored Plaintiff's condition throughout the day.  In fact, Dr. Thompson's decision to move Plaintiff to the ECU under constant watch was "for the protection of the inmate [Plaintiff] and others" until Plaintiff could be "in better control and stabilized psychiatrically."  Thompson Sec. Motion, at Ex. D-2, p. 9.   Second, Plaintiff conceded that Dr. Thompson's decision for him to be moved to ECU was in order for Plaintiff to "calm down." Stasicky Dep. at 46:18.  Specifically, Plaintiff testified: "I know if you ask me today what was Dr. Thompson's intentions, I know what he was doing.  He just wanted me to go to ECU, but he didn't say this to me before when we had talked about it earlier."  Id. at 46:14-19.  Further, Plaintiff testified about his prior visits with Dr. Thompson:

> Q.    In an of the visits with Dr. Thompson prior to the incident, do you remember what you discussed with him?
>
> A.    Yeah, absolutely.  I felt Dr. Thompson was one of the doctors that, you know, from the beginning I finally felt really comfortable with.  I was able to let more things out with him. I though he was a great guy.  It was easy to talk with him.
>
>     We talked about everything.  I went through everything.  We went through – I went all the way back to the childhood.  It was easy to talk to him.  He mad me feel at ease, you know. I didn't hide nothing from him.  He was honest with me so.

Id. at 35:13-36:2.

At most, Dr. Thompson's decision to place Plaintiff on suicide watch was negligent; however, the Court notes that Dr. Thompson's decision was not made in disregard to Plaintiff's safety.  Rather, Dr. Thompson ordered Plaintiff to be placed on suicide watch to protect Plaintiff – not to harm him.  Lastly, the Court already found in its September 6, 2006 Opinion that excessive force was not used during Plaintiff's extraction from his cell to the ECU, and further, as previously discussed, Plaintiff concedes that he may not have even been sexually assaulted. Sept. 6, 2006 Op. at 19.  The Court in its September 6, 2006 Opinion found:

> The videotape of Plaintiff's extraction from his cell and transportation to the ECU does not reflect the use of excessive force by any member of the extraction team.  In addition, Plaintiff's own statements call into question whether the alleged sexual assault ever happened.  By Plaintiff's own admission on the day of the alleged assault he was suffering from paranoia and instability, as well as feeling "foggy" and "unclear" as a result of a severe anxiety attack.  Plaintiff was also under the influence of prescription sleeping pills at the time of the alleged attack.  Further, Plaintiff admitted that his alleged rectal bleeding might have been caused by a chronic colon disorder from which he suffers.

Id.

The Court finds that Dr. Thompson was not deliberately indifferent to Plaintiff's safety and medical concerns, and therefore, the Court finds summary judgment in favor of Defendant Thompson appropriate.

## III.    CONCLUSION

For the forgoing reasons, Defendants' Motions for Summary Judgment on their claims against them are granted.

An appropriate Order shall follow.


/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date: June 12, 2007